Mr. Benjamin Woodhouse
2975 Kronprindsends Gade Suite. #8
Charlotte, VI. 00801.
805 478 1958
California Bar #261361

## THE CENTRAL DISTRICT COURT OF CALIFORNIA

Mr. Benjamin Woodhouse, A Citizen of
the United States, Resident of the U.S.
Virgin Islands

          Plaintiff,

    v.

The United States Government, the
Chief Justice Hon. John Roberts, Acting
as a Government Official, a District of
Columbia citizen, Gibson Dunn Inc., A
California Corporation, Facebook Inc.,
a Delaware Corporation, Nike Inc., a
Delaware Corporation, Alphabet Inc., a
California Corporation, the Hon.
Andrew D. Hurwitz, Government
Official, Acting as a Government
Official, resident of Arizona, the Hon.
Jacquelyn Nguyen, Acting as a
Government Official, resident of
California, the Hon. Fernando Olguin,
Acting as a Government Official, the
resident of California, the Hon. Manuel

Case No.: 2:21-cv-06372

**Plaintiff's *Complaint*.**

Real, Acting as a Government Official,
resident of California, Hon. Philip
Gutierrez, Acting as a Government
Official, and resident of California, the
Hon. Richard Paez, Acting as a
Government Official,  resident of
California, and the Hon. Sidney
Thomas, Acting as a Government
Official, resident of Montana,

Defendants

---

# **COMPLAINT.**

## I.  **INTRODUCTION.**

### **Part I.**

The Plaintiff, here, brings an action against the United States Government, Gibson Dunn Inc., and Facebook Inc., among other Defendants.  The *Complaint* is in two parts, but as the Claims and named Defendants are related, it is in the interest of Justice and economies to bring this action as One.  Further, both Claims have an underlying nexus of discrimination.  The first part, brings Federal Claims

against the United States Federal Government for: repeatedly endangering the Plaintiff's life, incorporating the Plaintiff into Government terrorist response strategies without consent, in a terrorist criminal situation, failing to respond with proper Federal procedures after known attempted assassinations on the Plaintiff's life, which the Plaintiff witnessed, intentionally inflicted bodily harm, Torture of the Plaintiff, with military grade weaponry, strategic and purposeful interference with private email communications in order to interfere with Plaintiff's economic gain, and interference of Plaintiff's trade relations with other Governments. *U.S. v. Hylton*, 2009 WL 136867. (Negligent endangerment of person found by the District Court). *18 U.S.C. Section 2340A*. *18 U.S. Code Section 1590*. *25 C.F.R. Section 11.426*. *18 U.S.C.A. Section 9045*. *D.O.J. 13-1332* (D.O.J.) (Defendant charged with furnishing materials to commit terrorism). *U.S. v. Ramsey*, 431 U.S. 606 (1972). (Warrant required to read private party's mail).

The second part of the *Complaint* is for the U.S. Government's condoning, encouraging, and procuring of bribes, in exchange for, both, campaign favors from Facebook Inc., payments from Gibson Dunn Inc., and payments from Facebook Inc.'s ancillary companies, and consultants, to Judicial officers at multiple levels, and their respective contacts. Such alleged bribes, here, encompass but are not limited to: cash payments to Judicial officers and their respective associates, paid receptions, hiring of Judicial clerks in quid pro quo schemes, and procured favors,

both, to sitting Judges, and across a network of Judicial officers.  We also allege improper video surveillance within private property of the Plaintiff's family members by the conflicted Parties in this action.  Facebook Inc. and its hired consultants, here, allegedly contracted with numerous Firms in: North Dakota, South Dakota, Idaho, and Montana, to create artificial businesses, in order to transfer compensation to Judicial officers, and in order to gain judicial favors from Government Leaders, who represented those economically challenged States.

Additionally, Campaign contributions are specifically referenced in the Federal Bribery statue, and sufficient, here, to constitute a violation.  *18 U.S.C. Section 201.  Reyes v. Atlantic Richfield Co.*, 12 F. 3d 1464 (1993).  The *Complaint* also concerns specifically the alleged illegal taking of bribes by all of the named Government Judicial officers, across various matters.  These Judicial Officers, and Staff, allegedly frequently met with Gibson Dunn Inc. and Facebook Inc. personnel, without any opposing Counsel's presence consistently.  Such alleged illegal bribes materially impacted the legal rights of the Plaintiff's company, and **ultimately resulted in the 9th Circuit's removal of private records and conflict checks from U.S. case law – a basic core foundation of the fabric of our entire society, in *Case No. 18-56304, and No. 18-56607*.  The loss of private records and conflicts checks has caused irreparable harm to the American people, and**

**a National security structure cannot be maintained with a 9th Circuit case that obliterates private records.**

Furthermore, these bribes are alleged to be paid by Members of: Gibson Dunn Inc., Facebook Inc., and Facebook Inc.'s contractors.  Facebook Inc. and Gibson Dunn Inc. are known to use a host of consulting companies, and hired forensic firms, which specialize in improper contacts with Judicial officers.  These Judicial officials span all levels of the Courts, including our purported highest-level Judicial Leader, and operate within a patterned and systematic framework, which has been implemented by Gibson Dunn Inc.'s Leadership and Facebook Inc.'s Leadership, along with its hundreds of millions of dollars a year legal case contractors.

Furthermore, alleged contacts between Gibson Dunn violators, and Chief Justice John Roberts are also lucid, and surpass the level of judicial prudence, and decency.  The Chief Justice, here, even allegedly takes calls from Ms. Cheryl Sandberg, on a regular basis, which serves no purpose, and calls into question the Chief's mental fitness for the position.  Such impropriate actions, include but are not limited to, specifically alleged: paid receptions by Gibson Dunn Inc., hiring of Supreme Court clerks into Gibson Dunn Inc., in a quid pro quo scheme, and procured favors, which spans an entire Judicial network from California to Washington D.C.  **Chief Justice Roberts allegedly had multiple**

**communications with Gibson Dunn personnel around Plaintiff's cases, and
believed that Parties, in weaker economic positions could be defeated, even in
the wake of felonies and historic conflicts, under his Machiavellian
dictatorship, blatant disregard for the future of Law Students nationwide, and
sycophant relationship with Gibson Dunn funders.** He forgot he serves the
American People, and not a handful of alleged morally defunct attorneys at
specific behemoth Firms.  A Judicial Clerk of the Hon. John Roberts was hired into
the Dallas office of Gibson Dunn, here, as part of such a quid pro scheme.  **This is
one of the many reasons why the People Republic of China's Government,
and many other major  Government Leaders have chosen frequently, not to
do business with Facebook Inc., as their alleged propensity to "bribe
Government officials," is a material threat to the subsistence of any major
Government.**

The Plaintiff also brings an action for deliberate Fraud on the Court, against
Facebook Inc., and Gibson Dunn Inc. respectively for failing to disclose payments
to Mr. Barack Obama, and Ms. Hillary Clinton, which is material as they were,
either, the Presidential nominator, or, then spouse of the Presidential nominator, of
the alleged bribed Judicial officers, at both, the District Court level, and the
Appellate level in various matters.  *18 U.S. Section 1001.*  Facebook Inc. and
Gibson Dunn Inc., here, also failed to disclose improper contacts and meetings

with, both, Appellate, and District Court level Judicial Officers, and Clerks, in direct violation of the *California Bar Rules*. *Id.* *Model Rules of Attorney Conduct*. Gibson Dunn Inc.'s counsel failed to confer at all, across cases, as they believed that there alleged paid bribes would wield victory, even in the face of plead felonies and a triple conflict. **The only time Gibson Dunn conferred, was to bark down the phone at a 9th Circuit mediator in an offensive manner, and insult the integrity of the 9th Circuit appellate process.**

**Additionally, Gibson Dunn Inc. allegedly, both, hired a past employee of its Firm in the U.S. Virgin Islands so that they could impersonate Plaintiff's Counsel in, both, matters, in addition to withholding smoking gun Memos, around price fixing in one matter, which M.T.O. Counsel had already communicated to Havensight's Counsel existed, and had come into their possession at the inception of the matter. We also allege that hired Virgin Island Counsel was instrumental in allocating bribes on Gibson Dunn's behalf to Judicial Officers.** Moreover, allegedly having paid a bribe, Gibson Dunn Inc. also failed to confer, and routinely denied its triple conflicted Clients of the ability to retain independent Counsel, despite multiple requests by the Plaintiff. **It was never even possible in this matter for the Plaintiff to structure a settlement agreement when all three almost trillion dollar defendants, were represented by the same Gibson Dunn Counsel, despite having diametric interests. Such**

**conflicts demonstrate an arrogance around such bribery, which is abysmal**
**and disgusting**.

In parallel, a Facebook Inc. Director, also, paid $100MM for a $20MM
home of an Entertainment executive director's home, initially before the ruling was
published.  As this bribe involves third party contact, with the Appellate Court, it is
within the purview of the U.S. Attorney to investigate this transaction, in
connection to Judicial interference.  Nevertheless, the Court should recognize that
the bribery schemes alleged, here, are not limited, either, to the triple conflicted
Defendants, or, the crooked Law Firm, they are comprehensive and multi
participatory.  The U.S. Attorney needs to create a special task force to create
policies, which require, and maintain separation between the Supreme Court,
Appellate Court, and Judicial Officers and large law firm Leaders, and Leaders of
trillion dollar companies.

In fact, Gibson Dunn Inc. Leaders allegedly routinely boast about this fact,
and their respective prowess, in manipulating Judicial officers through Client slush
funds, and fake accounts, which they classify for Supreme Court challenges.  Such
a practice, consequently, here, ended private records, and conflict checks
permanently in the practice of law, via the Appellate Court's defective and **terse**
**allegedly bribed 2 in 1, *Memorandum*, which even specifically cited to non-**
**existent legal Appellate filings.**  Let it be known that feigning confusion, is not a

panacea for taking bribes.  The 9th Circuit, there, also ended private records, not by offering legal authority, but by positing that stolen emails were, "not persuasive." *Appellate Court Memorandum in Case 18-5603*.  **Plead felonious conduct is always "persuasive," when 9th Circuit Judges legalize felonious conduct, Judicial bribery has reached a point that is completely untenable and sends a signal to other World Governments that we are totally corrupt.  *Id*.**

This felonious action, here, reinforces the iron communist like grip of Gibson Dunn Inc., and the Largest Tech Companies in America, over the Judiciary of the United States, and other counterparts in the economy.  Moreover, the United States government has subsequently inadvertently eroded its regulatory power, as a result of witnessing, and condoning this bribery, in direct violation of Federal Anti-Bribery Statues.  *Id*.  While this case, makes no political arguments, **Facebook Inc., here, has lobbied for, and succeeded, in removing civil liability specifically and explicitly just for themselves, in Canada and Mexico, from the North American Trade Agreement, which recently replaced N.A.F.T.A., and will likely lobby the legislature to remove the legal profession in the coming years from U.S. statutory law – Judicial bribes are not the only issue, the very existence of a legal system, which dates back to feudal England is now almost completely eradicated as a result of the 9th Circuit's inability to function in any capacity**.  In short, our Judiciary is now mirroring, those of third world

countries, and is not only making a mockery of U.S. Leadership, but also oppressing many, who borrow millions, and sacrifice time with family to pursue a now completely defunct legal profession.  In fact, Facebook Inc. is an incredible 47 and zero with absolutely no settled cases and no remands in the California Appellate Court, in one meaningless matter involving a California County, the Judge actually ordered an O.S.C. against Facebook Inc.'s Counsel and then two weeks later, suddenly changed his mind, and chose to rule for them in an epitome of the Court's total lack of volition.  **U.S. Law Students have no future, and unfortunately, they do not have an ability to take action against these Appellate Judges, who have lined their respective pockets, and propped up the Montana economy with the bribes from Gibson Dunn.**

Moreover, non-disclosed payments to high ranking former Presidential executive office, former first ladies, and high-ranking appointed U.S. State officials, who coincidentally also appointed the alleged bribed Judges in question, here, were also paid by Facebook Inc. and Gibson Dunn Inc.  *U.S. v. Russo*, 104 F.3d 431 (1997). (Lying to impede due administration of justice, was obstruction). This conduct should be grounds for immediate discovery, around undisclosed conflicts.  **In one instance, in a case involving another Party, Facebook Inc. hired the Magistrate Judge assigned to the case, while the case was pending, in an act of complete disregard for the Judicial system which is hard to even**

**contemplate.  I am unsure why they have not also hired the Appellate Judges in this matter yet.**  Many Judges are sitting out of jurisdiction in the 9th Circuit, which has been deemed illegal by the Supreme Court, because the 9th Circuit are allegedly exchanging bribes with other Jurisdictions, to make the bribery scheme more expansive, in a scene that makes me want to close the 9th Circuit indefinitely, and seek National security prison terms for many of its Members.

**Just to be precise and comprehensive: Facebook, in this matter, here, filed documents late, failed to serve any Appellate documents, filed a *Brief* that was too long, filed a *Brief* late based on its failure to serve, failed to confer on its *Demurrer* in the State Court, argued facts in default at a *Demurrer* hearing, failed to write Counsel's name in the State Court, improperly used *See* in its *Appellate Motion*, which was not served, created the first triple conflict in legal history, failed to set the *Appellate Record*, argued a case in its *Brief* that did not stand for its position, routinely had improper contacts with the Court, removing a *Motion* from the District Court, after failing to respond, and plead the felonious taking of emails across two of the three conflicted matters, and prevailed with sanctions.**

Finally, the allegedly bribed Appellate Court's ending of conflict checks, and private records, here, seriously quell all Plaintiff's speech, and calls into question the future operability of a legal profession.  This suit is filed, not only to

11   *COMPLAINT*

assert the rights of the Plaintiff, but also to encourage stewards of the legal profession to step up, and protect the independence of U.S. Courts, which are not being safeguarded at the same pace as the growth of burgeoning tech companies. **When felonies and conflicts prevail, it makes us a mockery to the entire world, even Countries, which have bribery as part of its customs, still have more responsible Courts than of those based in the United States.** Law Students should be refunded their tuition by the United States Government, until the Government can restore some decency back to the Judiciary. **Moreover, the Plaintiff asserts that the Hon. John Roberts might have allegedly specifically engaged in bribery in this matter, in retaliation for the Plaintiff's dissention at endangering his life, and criticism of the U.S. Government's torture tactics.**

Furthermore, all of these felonious acts, have jeopardized the public, safety and well-being of all Americans, and parallel the alleged Judicial bribery, here, which has ended private records, and conflict checks in case law. This matter speaks to the rights of private citizens to be free from homicidal government negligence, and the tyranny of trillion-dollar defendants, whose Leaders are not intelligent enough to surreptitiously dole bribes, and provide consideration for their loquacious and bombastic pay to play system. **Judges need to learn how to follow procedure when they take bribes, and not constantly move pre-maturely constantly in reaction to bribes.** The moral defectiveness of all of this

behavior, is like Facebook Inc., and Nike Inc. board members, each, collecting handouts from the Chinese Government, while denying opportunities for small business owners, and then running around accusing others of looking for handouts. Such behavior disgraces our Country and dishonors all Americans, much like the Appellate and Supreme Court has done.

Additionally, Facebook Inc., and Gibson Dunn, here, allegedly, and the other two conflicted Parties in this matter, on an imputed basis are liable for, the continued running down, and interference with prospective Customers.  **The Plaintiff alleges that Facebook Inc. and Gibson Dunn paid consideration to a banking firm, which the Plaintiff was attempting to confer with, on a public offering, concerning one of its portfolio companies.  Facebook Inc. and the three conflicted Clients, should all be held liable for this offering.  Further, the Plaintiff also alleges that almost every single prospective and current Customer was contacted by Facebook Inc., and Gibson Dunn, via contractors, after Facebook Inc. feloniously accessed the Plaintiff's business email, and obtained the Plaintiff Customer information.**

Moreover, if such illegal accessing of the Plaintiff's email, and bribing prospective Bankers and Customers not to do business, with the Plaintiff was not enough, these triple conflicted Companies, here, actually worked in coercion, with U.S. Secret Service Agents, to sexually harass the Plaintiff, and consistently harass

the Plaintiff with people of a homosexual orientation, when the Secret Service and Defendants, were well aware that the Plaintiff was heterosexual. Further, the Defendants failed to disclose any of this sexual torture in coercion with the Secret Service, and it is both alleged and believed that they engaged in it, as part of a compensatory scheme with Judicial Officers. Chief John Roberts will have to answer for this, as it is alleged that he directed the Secret Service to engage in illegal behavior.

**Further, lower level State Judges, and Federal Judges, both, were engaged in participating in the harassment, in return for sexual favors procured from prostitutes that Facebook Inc. and the Secret Service had procured, as part of this very brain damaged quid pro scheme.** Facebook Inc. and Gibson Dunn continued to engage in these activities, with Secret Service, even after the Plaintiff warned all Parties in writing that such a scheme was illegal, and that Quasi U.S. Government Security Agencies would not allow Gibson Dunn and the Secret Service to end private records and conflict checks, as part of a quid pro quo bribery scheme, one where Judges participated in the economic spoils of covering up felonies, and attacking small Business Leaders.

**The Plaintiff also alleges that Gibson Dunn, either, with, or, without, the knowledge of the Secret Service, planted cameras in a guest bedroom of the private residence of a family Member for the Plaintiff, and a bathroom, and**

**even responded to the camera, while surveilling the Plaintiff at a hotel across the street.  This was an act of very minimal brilliance, and beyond puerile and atavistic on many levels.**  The conflicted Defendants, here, made no representation to refute such an allegation, on attempted conferrals.  Moreover, such conflicted cohesion among: Secret Service, Judicial Officers, and Gibson Dunn, which was acting as an agent for the three trillion dollar conflicted companies, is not in the interest of the U.S. Government, and portends, not only the end of the legal profession, but very dangerous future macro economic risks.

## Part II.

The Plaintiff additionally alleges that the U.S. government illegally injected the Plaintiff into terrorist response situations for unknown reasons and with malicious attempt to harm the Plaintiff. Specifically, here, the United States Government also failed to, either, assist, or, follow proper Government safety procedures, after the Plaintiff witnessed, multiple blocked assassination attempts on his life, which were executed as a direct result of the U.S. government's public endangerment of the Plaintiff.  The initial set of assassination attempts occurred, while the Plaintiff was studying in his final year of his Law school training in

Malibu, CA., but such attempts also occurred in Sydney, Australia, while the Plaintiff unsuccessfully tried to escape U.S. government persecution.

Moreover, the Plaintiff requested assistance from the U.S. Government after each one of these initial assassination attempts, via liaisons with Pepperdine Law Leadership, which represented to be in communication with National security directives from the Executive Branch of the United States Government. The Plaintiff did not have direct knowledge of these communications, and erroneously assumed that Pepperdine Leadership was capable of making reasonable risk assessments. Further, such witnessed assassination attempts include, both, attempts from private criminal actors, and later by foreign sovereign military personnel after the Plaintiff's graduation from Law school at the direction of foreign governments. These murder attempts were a direct result, of the U.S. Government negligently inserting the Plaintiff into National security matters, which did not concern the Plaintiff, and which the Plaintiff was astute enough to actively avoid.

Moreover, these assassination attempts were witnessed on multiple occasions by the Plaintiff, and it is likely that other unwitnessed attempts, also occurred. The U.S. government had full knowledge that it was recklessly endangering of a then private U.S. citizen, whose rights were protected under the *U.S. Constitution*. Additionally, the Plaintiff was instructed, not to alert Law

school classmates, and others about imminent threats and dangers, after these assassination attempts, and this caused severe emotional distress.

The Plaintiff also vehemently disagreed with the U.S. Government, and Pepperdine Law Leadership, advocating for the immediate closure of Pepperdine law school to only essential Faculty, Administration, and Students, after the second attempted hit on his life, and the murdering of special warfare personnel. Consequently, the U.S. Government retaliated for voicing this dissention. National Security gallant was championed, over the safety and well-being of the Plaintiff, and his fellow Pepperdine law classmates at each, and every turn.

In addition, the *Complaint* is also brought for acts of torture against Plaintiff, in subsequent series to the initial public endangerment.  These acts of torture include but are not limited to, sexual torture, and torture via the illegal use of, either, U.S. Air Force, or, Naval aircrafts in Californian airspace, which were flown over the Plaintiff's household, and used to burn the body and skin of Plaintiff, utilizing specialized and classified weapons for a period of three months. Known to Military personnel as "the Flash," this barbaric special weapon, shows up as a square flash of silver light from the military aircraft, before the victim is burned, via some kind of thermal heating system which is fired down, the Plaintiff can present witnesses, who can attest to the Plaintiff's screams from the burning, which occurred after he firing of the weapon, which happens instantaneously.

Such burning, in this instance, includes all extremities of the body, as the weapon targets close to 30% of the entire body when utilized, and its use is a direct violation of the Geneva convention on torture.  The weapon was fired while the Plaintiff resided in Danville, California, after subsequent graduation from Pepperdine law school over a three-month period and then briefly while the Plaintiff was in Sydney, Australia.  Each, and every remembered attack was executed at night.

Further, there were three attempts to "flash and burn" the Plaintiff, while the Plaintiff was residing in Sydney Australia, but the weapon was inoculated, after the first attempt, by some type of solar panel affixtures, which were placed on the Plaintiff's apartment roof by a South Korean intelligence contingent, after the first attack, and the Plaintiff witnessed the South Koreans climbing the roof with these blocking devices.  Whether the South Koreans were part of a United Nations funded group, and operating at the request of United Nations Leadership, is unknown.  The Plaintiff concedes that he could not identify the air crafts used in, either, the attacks in Australia, or, the U.S. as the planes were above the roof of the Plaintiff, but the special weapon was identical in nature in each and every respect, across attacks, and the Plaintiff believes that the attacks were U.S. military strikes. There have been no further aerial attacks since the Plaintiff left Australia in 2010.

A discovery process will determine if members of the Secret Service Government Agency, played a role in the retaliatory acts, against the Plaintiff.  The Plaintiff intends to make discovery requests, directed to the office of the Secret Service General Counsel, once this case advances, after sending repeated warnings in writing.  The requests pertain to the Secret Service providing escorts to Judges at Gibson Dunn's expense, logging onto the Plaintiff internet networks, and organizing homosexuals to harass the Plaintiff, when the Agents were aware that the Plaintiff was heterosexual.  The U.S. Attorneys in this matter, should advise the Office of the Secret Service in writing that the Plaintiff has filed this Suit, and does not wish Secret Service Personnel, to come within 50 miles of the Plaintiff for any reason whatsoever and at any time, unless required by law to do so, on credible evidence, in order to protect assigned U.S. elected officials, Supreme Court Justices, and State dignitaries.

**Additionally, the Court, here, should move on its own to issue injunctive relief independent of the Plaintiff's request for relief, which directs the U.S. Government to remove all and any of the following: National Security, Central Intelligence Agency, Military of any Branch, Secret Service, and any Government protective details from, either, surveillance, or, purported protection of the Plaintiff, without an issued warrant by a Federal Judge which specifically states a logical purpose for the monitoring of the Plaintiff.**

**The Plaintiff wants no offered protection from any U.S. government entity whatsoever, and wants any and all Military personnel, Central Intelligence Agency, or even Secret service personnel ,to be imprisoned if they come in proximity of Plaintiff without just cause and an issued warrant, and to cease and desist all activity immediately.  *See Steve Jackson Games, Inc. v. US Secret Service*, 816 F. Supp. 432 (W.D. Tex. 1993).  The Plaintiff does not seek the Court to move on its own to enjoin United Nations personnel, and such personnel for monitoring of future Geneva Convention violations.  The Plaintiff also requests that the Judge cite to the death penalty for any use of Department of Defense tech on the Plaintiff, without specific authority to, either, from the Executive Branch, or, a Judicially issued warrant.**

Furthermore, this torture was further complimented with funding from Government agencies, which were used to violate the Plaintiff's access to electronic communications-interfering, with economic gain, and defaming the Plaintiff to private actors.  **The Plaintiff alleges that his Alphabet Inc. emails were directed to Department of Defense personnel and Pepperdine University Leadership Associated Personnel, for no reason, and without consent, instead of the intended recipients.**  These personnel also misrepresented themselves and responded to these communications as the intended recipients.  **Ironically, and collaterally, the Department of Defense might find some legal defense, in the**

**<u>recent eradication of private records by the Appellate Court, as a result of Judiciary bribery.</u>**  *Case No. 18-56304.*

The Plaintiff specifically found electronic communication responses to be uniform and identical, despite the diversity of recipients.  Often, responses to electronic communications were unhelpful, and followed glib script.  The Plaintiff never ever consented to allowing, any of the following: the Department of Defense, U.S. government, Associated individuals with Pepperdine University and its Leadership, or any other Party, as a private citizen, to control his personal Gmail account.  This is why Alphabet Inc. is a named Party in this matter, in conjunction with Gibson Dunn's Inc.'s bribery of Judicial officials, while engaging in conflicted representation.

The U.S. government also engaged, in addition, in psychological torture against the Plaintiff, which included but was not limited to, the U.S. government utilizing the military to direct large numbers of individuals of a homosexual orientation from around the World to attempt to meet the Plaintiff, despite the Plaintiff, who is heterosexual, specifically choosing not to meet any of these individuals, recruited by the U.S. Government.  The U.S. Government was aware that the Plaintiff was heterosexual, and there was no logic behind these actions, other than harassment.  Why other foreign Governments were complicit with, this practice, and helped to fund this practice, is unknown?  Moreover, it is the

Plaintiff's legal opinion that such a course of action, further endangered his life with this introduction of unnecessary surveillance from non-government actors, who were being consistently recruited by Government personnel for harassment. The Plaintiff is heterosexual, and there is no further need for the U.S. military or intelligence Agencies to waste U.S. government money in recruiting People of a homosexual orientation that are non government actors, specifically for the purpose of trying to harass and torture the Plaintiff.

Moreover, the Plaintiff also alleges that the U.S. Government, either, worked in concert, or, was complicit with harassment from Mr. Branson, who in an attempt to help known terrorists in the National Security matter, attempted to fund torture of the Plaintiff. Specifically, the U.S. Government orchestrating Mr. Branson's bet with a Russian counterpart for a space shuttle on the sexuality of the Defendant, in order to torture the Defendant, and cleverly couple it with D.O.D. technology use, which was constantly applied to the Defendant, in consistent and frequent fits of terrorist behavior by U.S. Government Personnel. The torture program was comprehensive, spanned continents, and was even implemented on holidays such as Christmas. It was applied with consistent 24/7 application. **This is the basis for the Court moving on its own, here, to enjoin these U.S. Agencies, Department of Defense, and Military from having any contact whatsoever with the Plaintiff.**

Moreover, the Plaintiff was also intimidated through these practices, and encouraged to disengage any business relationship with the People's Republic of China, which inherently damaged the economic opportunities for the Plaintiff.  The Plaintiff was encouraged to ignore Chinese officials, and disengage with business trade, and private placements of Capital, with threats of further retaliation against the Plaintiff, if trade with Chinese officials was enacted.  Eventually, the U.S. government would encourage Chinese officials to join them in their harassment of the Plaintiff, on the basis that they were funding civil liberties for others, and that promoting the business interests of others, would in turn champion an elitism, which was more in step with Asian business class structures.

Further, the U.S. Government, here, further retaliated against the Plaintiff, ending private records and conflict checks at the Appellate law level, in a matter involving the Plaintiff's investment firm, and trillion-dollar defendant, Facebook Inc.  There, the Appellate Court failed to enforce the felonious conduct of Facebook Inc., in retaliation for the Plaintiff's dissenting against the public endangerment.

Moreover, the U.S. government also allegedly had full knowledge of Facebook Inc. and Gibson Dunn Inc., paying bribes through independent contractors to, both, Judicial officials, and their respective relatives, and acquaintances, at the District and the Appellate Court levels, along with organized criminals.

Further, the U.S. Government allegedly complied at all levels, with the Appellate Judicial offices to specifically end the legal profession, and to erase basic legal tenet foundations, with a spiteful intention to restrict the Plaintiff from having the economic resources, to report the alleged torture and the public endangerment.  Additionally, the U.S. Government had full knowledge that Gibson Dunn Inc. and Facebook Inc., along with its contractors had made payment to former highly elected officials, including Presidents, and Secretaries of State, who had a role in appointing the Appellate Judges.  These specific conflicts in addition to the already triple conflicted status of Facebook Inc. in this matter, were never disclosed to the Plaintiff, and the Judiciary and Facebook Inc., both, intentionally served to undermine democracy, and free speech by allowing this practice to continue at, both, the District Court, and Appellate Court levels.  **This point is further solidified by the 9th Circuit, upholding a prison sentence for a Defendant, named Mr. Sing for the stealing of private records, only to rule months later against the Plaintiff, and uphold the felonious stealing of counsel emails by Facebook Inc., in the bizarre ending of private records.**  *U.S. v. Sing*, 16-50221 (9th Circuit 2018).

Moreover, Sing's counsel should cite to our Appellate *Memorandum*, and garner the Defendant's immediate response.  It should also be noted that not only did Facebook Inc.'s counsel, not go to prison for the same conduct, but she failed

24   *COMPLAINT*

to make any offer of settlement at any point in the case, suggesting that she truly believed Facebook Inc. had taken full control of the Appellate Court, without any chance of independent supervision.

**The Plaintiff is not trying to demonize Judicial officers with this filing, as it is a noble and complex position, it is simply stating that when a Defendant prevails after: committing felonies, being triple conflicted, filing late documents, failing to serve Appellate documents, arguing a case that does not stand for their position, arguing facts in a *Demurrer* hearing, on a Demurrer not conferred upon, and filing a Brief too long, the Appellate Court is no longer functional in any capacity, and the U.S. economy simply cannot sustain a singular attorney, who is committing felonies, and representing every major trillion dollar Company at once.** *18 U.S.C. Section 201.  18 U.S.C. Section 1962.*

Moreover, it should be noted, even if Executive powers cloaked some components of the U.S. Government's conduct in its public endangerment and torture, there is no Government immunity, to the bribery of Federal officials by private actors, and in the name of furthering Government targeting, at the expense of the rights of the public, and the U.S. economy.

Finally, the Plaintiff also moves the Court to order discovery, before ruling on the Government initial dismissal document, and allow the Plaintiff to recover the satellite imagery, and communications from the United States Government's satellite resources, which exist, and prove cash payments to relatives of Judicial Officers at, both, the Appellate, and District level, in conjunction with those of known Leaders of Organized criminal entities, who have known connections to select Judicial Officers.  Further, all satellite imagery showing Judicial officers visiting Gibson Dunn personnel should also be recovered upon subpoena. Additionally, the Statue of Limitations does not preclude this action, as all tortious action has continued from the 2008 time period to the present.

## II. <u>VENUE AND SUBJECT MATTER JURISDICTION</u>

Venue is proper, here, as this is the District in which the torts took place, specifically in Los Angeles.  *28 U.S. Section 1391.*  Subject matter jurisdiction is proper, here, as the torts arise from violations of Federal Statues.  *18 U.S. Code Section 201.*

## III.   <u>STATEMENT OF FACTS</u>

## **STATEMENT OF FACTS A.**

In the third year of Plaintiff's Law school training at Pepperdine Law School, in the fall of 2008, an organized criminal by the name of Mr. Rafiello Follieri, who at the time was a reputed Italian organized criminal moved into Malibu, CA.  He commenced bringing large amounts of organized criminals into the small beach town to intimidate local residents, shortly after his arrival.  His presence was easy to identify in the small town, as European agents, on rare branded motorcycles frequently followed him around Malibu.  Around four weeks into the start of the last semester of the Plaintiff's law school training, Mr. Follieri was seen by Plaintiff traveling to the residential premise of Pepperdine University's then acting President, Mr. Andrew Benton, in a Black B.M.W., who was known to Plaintiff, and whose residence is situated in close proximity to the Pepperdine law campus.

Additionally, Mr. Benton's daughter was a law school classmate, and Mr. Woodhouse and Mr. Benton had met at various School functions in the normal course of Mr. Benton's duties, and Mr. Woodhouse Law Student candidacy.  That evening, Mr. Benton emailed the Plaintiff, who was a third year Pepperdine law Student on his Pepperdine issued email account to request that the Plaintiff show Mr. Follieri around campus, the following morning.  The Plaintiff failed to respond

to Mr. Benton's email, and opted not to host the reputed organized criminal the following morning, knowing that he was not a welcome acquaintance.

Further, Future events would lead the Plaintiff to believe that Mr. Benton had represented to the organized criminal that he was perhaps the highest-ranking Leader on the campus, and the appropriate person to negotiate with, over Follieri's attempt to take control over the private campus. The Plaintiff had witnessed Follieri's associates setting up surveillance posts, and road blocks, on the side of the only road into Malibu, shortly after his arrival, and had concluded, he was to be avoided at all cost. Such a representation by Mr. Benton to Mr. Follieri was not logical. While sitting in the Law Class, the following morning, Mr. Follieri sat directly behind Plaintiff, along with six other heavily set and possibly armed organized criminals, in an attempt to scare Plaintiff, and threaten bodily harm, which bizarrely embarrassed Plaintiff to his classmates.

Plaintiff subsequently ignored Mr. Follieri, refusing to make any communication to Mr. Follieri whatsoever, despite repeated attempts by him to confront the Plaintiff, in the Pepperdine's Law Library, and at other times on the Pepperdine Law campus. Mr. Benton then communicated to the Plaintiff that the situation was under control and that the U.S. Government, and Executive Branch, had been alerted to the unlawful presence of the organized criminal.

Moreover, the presence of the Criminal, also brought the arrival of voluminous organized criminals from various non related groups, and many of their respective Leaders, started to attempt to meet with Plaintiff, both, on and off the Pepperdine campus, as Mr. Benton had intimated that the Plaintiff was some kind of counter Terrorist Leader.  The Law school turned into a "zoo" immediately, and it became difficult to navigate the small building.  Plaintiff continued his daily routines, and about a week later, Plaintiff witnessed an assassination attempt on his life at his residence, late in the evening, in Malibu, CA., by a singular hit man, who carrying a hand gun attempted to breach the front door at the bottom of the Plaintiff's apartment.  The hit man was then neutralized by a special military warfare officer, who was situated underneath the apartment, in a tandem grouping, and was stationed there, without, either, the Plaintiff's consent, or, knowledge.  The hit was also carefully planned as it was a weekday and late in the evening, around 10:30 p.m.  There was some kind of artificial loud party gathering on the other side of the parking lot of the Plaintiff's residence, which initially caught the Plaintiff attention as exceptionally inordinate and brought him to the window, to witness the assassination attempt.

Although, a singular hit man was utilized, it seemed that the hit was carefully planned, and that the loud noise emanating from a group of thirty or forty people gathered, around a limousine, was created specially to cloak the

assassination.  This was not someone acting alone.  The U.S. government then

failed to proceed to confer with the Plaintiff on safety options for himself, and his

classmates at that point, but the Plaintiff assumed that the blocked hit, had removed

this random future danger at that point, and that military presence would back

down any future such behavior.

Almost five days later, the Plaintiff returned from his work as an

entertainment law clerk internship late in the evening to find Mr. Follieri and four

organized criminals in five highly expensive automobiles parked in front of the

Plaintiff's apartment, blocking the entrance to his personal residence.  Initially,

Plaintiff attempted to blast his radio to its highest volume with the windows down

in order to scare the assailants from blocking the door to his personal residence.

After about four minutes, with no Party moving, the Plaintiff chose to rapidly pop

his trunk and exit his vehicle, and attempted to approach the entrance of his

apartment and the cars with assailants, the organized criminals, then immediately

fled the scene in their cars, and may have erroneously perceived the Plaintiff's

book bag to have contained weapons.  Plaintiff erroneously assumed that the

special warfare officers were waiting behind the assailants.  The Plaintiff then

noticed multiple military special warfare defense personnel, who were initially

situated under his apartment to be dead, and shaped in unnatural positions, and

there was an unusual amount of flies and oder, which protruded from the apartment

entrance. Plaintiff returned to his apartment to puke and cough up blood from his stomach.  The Warfare personnel were then removed from the premises by Parties unknown to the Plaintiff in Government licensed vans in the early morning hours.

The following morning, the Plaintiff communicated to Mr. Benton's daughter that an immediate closing of the school to only required Personnel, and Students, was the proper choice of action.  She replied that the situation was "under control" and that the Law School would remain open with my fellow classmates, not being apprised of any of the attacks.  The Plaintiff had to ignore, and upset almost all classmates, as Mr. Follieri's associates were concurrently sitting next to the Plaintiff in most classes, after the multiple incidents at the Plaintiff's residence.  Pepperdine Leadership had decided that inviting them to take the classes with the Plaintiff was the best course of action.  This permanently damaged the relationship between Plaintiff and his classmates, and Pepperdine's Faculty, as Plaintiff had to shun all personnel and fail to show any connection to any Law School community Member.  Moreover, the Plaintiff experienced death threats in the double digits, on a daily basis from a variety of organized criminals, during every course of every day life.  Filling the Plaintiff's car with gas became a struggle, and could not be accomplished outside of Malibu in stations, which might be bordered by multiple streets and flowing traffic.

Further, it should also be stated for the record that although Mr. Follieri was publicly cited as romantically connected to public actresses in the media, during this time, the Plaintiff never met any of Mr. Follieri's female companions of any kind, and in any capacity whatsoever at any time. The Plaintiff does not believe seeing, either, any such linked Party, or, being in proximity to any such Party whatsoever, and the Plaintiff spent a majority of his time in the Law Library, and attending law classes, during this law school period. Plaintiff had a perfect attendance record and spent more than 12 hours a day in the Pepperdine law facility. Moreover, the Plaintiff has never tried, either, to interact with any of Mr. Follieri's personal contacts at any point in time, or, come within proximity to any of his personal contacts.

Further, only the defendants listed are currently Party to this Suit, and the Plaintiff does not specifically allege that the U.S. Government tortured the Plaintiff, in retaliation, to protect the identities of any public figures, who might have been linked to Mr. Follieri, and might have had pecuniary interest to Movie Studios. It is unknown whether it is coincidental that the Universal Studios Head sold his $20MM house to a Facebook Director for $100MM, with alleged promises of favors to a certain Hispanic American actress, in return for Judge Paiz ending private records and conflict checks.

The Plaintiff also asserts under oath that he has never traversed in his three years of residency in Malibu, on any private property not completely open to the commercial public, other than Pepperdine's law campus, and his personal residency, except for once at an Open house in 2005, and once in 2017, both, with a respective real estate agent's complete supervision.  Moreover, Plaintiff rarely spent time in public places in Malibu, except for grocery shopping, and periodic meals at fast service restaurants.  **_Ironically, whether rumors of Mr. Follieri and his associates alleged stalking of the actor Mr. Heath Ledger, a Los Angeles resident at the time, is the reason why he took his own life, is not raised in this Complaint._**

The Plaintiff then completed his law studies without further incident, but gradually started to experience harassment and beyond hazing from the U.S. military, predicated on the concept that perhaps the Plaintiff had been pretending to be a Naval warfare officer, which seemed strange as the Plaintiff had attended all law school classes, and was a private acting law Student, seeking employment as an attorney.  Warfare officers wear military clothing, and clandestine service officers, never reveal their employer, thus such allegations were not very rational. This harassment included frequent visits by unknown people of homosexual orientation, encouraged by the U.S. military in retaliation for some kind of fear of future heroic recognition, despite the military, knowing that the Plaintiff was

heterosexual and had purposefully abstained from sexual relations for a period of four months to protect his classmates, and friends, under surrounding circumstances.

Moreover, military personnel were instructed to have total strangers yell, "fun" at the Plaintiff in a very illogical manner, predicated on some kind of rumor that the Plaintiff had intimated that this heinous experience was fun, which had no merit, this practice continued for almost six years, in public places, and was dubbed across television shows by the U.S. Government. **The stress of the overall terrorist incident is one that nobody reading this *Complaint* could ever contemplate, which still has never actually ended.** Additionally, the Plaintiff voiced his concern, to both, the Department of Justice in San Francisco, who told him to complete a questionnaire, and to multiple Senators, via correspondences, shortly after graduating law school and in proximity to the incident.

Also, the Plaintiff contacted the U.S. Senators, after the Military continued to create diagrams of penises on the Plaintiff's Garmin G.P.S. system, which utilized a route highlight system, both, in the late evenings in unknown destinations, and in more than one instance while the Plaintiff was being pursued by organized criminal hit men, such that the Plaintiff could not navigate routes. Often, the Plaintiff would become increasingly more disoriented as the interferences would come intermittently, and randomly for absolutely no purpose

than harassment.  The Plaintiff returned, to his Parents residence in Danville, California, without a legal position, and uncertainty around his future, at which point the U.S. military commenced burning the Plaintiff in the middle of the night for three to four seconds bouts, utilizing specialized and clandestine, "flash" weaponry, which causes a silver square flash above the victim, before the burning occurs.  The Plaintiff was burned in his extremities, and on one evening, was burned multiple times by multiple flashes, meaning the aircraft returned to the spot of the initial torture.  The burning happened about three evenings a week over a two month period.

Consequently, the Plaintiff signed up for a graduate education Law program in Australia, and moved to Sydney Australia, to escape U.S. government persecution, and predicated on escaping the flash burning.  His intention was to become an Australian citizen.  There, either, from confusion as to whether the Plaintiff was, either, a government actor, or, encouraged by U.S. Government malfeasance, the Plaintiff witnessed multiple assassination attempts on his life.

Specifically, by gunfire into the window of the Plaintiff's apartment complex, and one attempt by a foreign military actor, who dropped down, utilizing a parachute onto the balcony of the Plaintiff's apartment, and affixed two canisters of lethal gas into the Plaintiff's window, which happened to be open, as the attack was not foreseen.  The Plaintiff suffered irritation to the chest and lungs and was

displaced from his apartment for a two week period.  Moreover, an organized criminal additionally brandished a weapon under a newspaper, with a silencer attachment, on a public bus in the last attack, while the Plaintiff was traveling to the University of Sydney, but the Plaintiff is unsure if the encounter was, either, intended, or, happenstance, unlike the other assassination attempts.

Finally, on a separate occasion, an unknown foreign government pilot banked a fighter jet around a 12 story apartment complex, 3 stories up, which oversees Bondai beach, and attempted to fly the plane into the Plaintiff's person, in order to scare the Plaintiff, while Plaintiff was studying on the beach.  Such a unique threat from a foreign government entity was: unprovoked, never apologized for, and caused serious distress to the Plaintiff.  It also made it more difficult for the Plaintiff to have social interactions with locals.  The assault with the foreign fighter plane was a direct result of Mr. Benton, and the U.S. Government's odd past conscription of the Plaintiff, and confusion around the Plaintiff's private citizen status.

**Further, the U.S. Government's decision to end conflict checks, and private records to aide and abet a trillion-dollar computer Leader's plead felonies, in the wake of their torts, makes the Judicial bribery in this case, even more spurious, and deeply personal.**

The U.S. Government likely had knowledge of all attacks, and did nothing to, either, assist the Plaintiff, or, provide assurances of safeguards against future attacks.  More importantly, the U.S. government also failed to follow procedural regulations.  As a result of these failures, the Plaintiff was negligently endangered, and suffered distress as a result.

Further, the Plaintiff returned to the U.S. and found similar tactics of harassment and interference, along with purposeful interference with economic gain.  Specifically, the Plaintiff noted that his emails were not being responded to by their respective recipients, but what seemed like a Department of Defense officer, who might have allegedly had connection to Mr. Andrew Benton.  The emails contained uniform responses and almost identical fonts, styles, and writing. *U.S. v. Ramsey*.  Plaintiff is still unsure whether electronic communications are monitored and in what fashion.  Emails are sporadically sent thru, in bursts, and this issue has been exacerbated by the Defendant bring an action against Google, as one of the three conflicted Clients, for inconsistency in online ad pricing.

Moreover, the Plaintiff was intimidated into not doing business with officials from the People's Republic of China, who fund the growth and development of many of the Companies that the Plaintiff's investment firm competes with.  Frequently, when Plaintiff attempted to schedule meeting with these Leaders, they were, either, sent to wrong locations, or, prevented from appearing.  Eventually,

the U.S. Government convinced the People's Republic Leaders into not doing business with Plaintiff, and the Plaintiff frequently experienced increased bouts of interference with basic relations, after any attempt to do business with the People's Republic.  Plaintiff alleges that the Government also had knowledge that Mr. Benton collected money from the People's Republic of China, based on the concept that it would be used to protect Plaintiff from bodily harm.  Such a practice of extorting money from the P.R.C. Government, based on the reputation and good intentions of others, should not have been allowed, particularly as the Plaintiff struggled with food security and other financial issues.

Additionally, the stress caused from the harassment and the quasi terrorist behavior from the U.S. Government, has strained the Plaintiff's relationship with family members, and seriously inhibited the Plaintiff's ability to do business with foreign entities of all Nations.  Finally, the Plaintiff intends to request that: South Korean, Austrian, and Switzerland intelligence officials come to the U.S. District Court to testify to these above referenced statement of facts, as the Plaintiff believes that it is likely that these Leaders have substantial knowledge of many of the above referenced events, whether they witnessed them as a result of, either, the U.S. government's invitation, or, not, is unknown, but there presence was known, both, in the U.S. and Australia.

Additionally, the Plaintiff alleges that U.S. Government Officials gave access to Mr. Richard Branson, a British Citizen to our National security structure and orchestrated a bet, with the Russian Government, where Mr. Branson would win a space shuttle if he could prove the Plaintiff was not heterosexual, even when all Parties involved knew the Plaintiff was heterosexual. The bet was part of an intricate torture scheme that was implemented, against the Plaintiff, in order to protect criminal actors, who had committed crimes in proximity to the Plaintiff. Moreover, the Department of Defense Officials also participated allegedly in the scheme, using special weapons to harass the Plaintiff, in an attempt to prove emotional instability, and win retribution for National security occurrences. Such a scheme failed as the Plaintiff, here, likely was assigned protection from a National Security agency that superseded all referenced criminal Government actors, who in this case were not properly disciplined, and do not possess the logical capacity to be empowered with such special weapons.

Whether John Roberts, and the Defendant 9th Circuit Judges, here, attempted to end private records and conflict check to further this scheme, and whether their collusion with Gibson Dunn, was symbiotic to this scheme, has to be further determined in discovery. Then again, it is really of no consequence as to what the driving motivation for the ending of private records and conflict checks, and collusion was, only that the legal system currently has no volition. Private

record and conflict checks will be restored, via National Security protocols, and additional protocols need to be implemented, which can surpass the undue influence of these trillion dollar companies.

## STATEMENT OF FACTS B.

Havensight Capital L.L.C., which is the Plaintiff's owned investment firm, and consumer products retailing consortium, brought cases against Nike Inc., and Facebook Inc., as the Parties allegedly stole Havensight Capital L.L.C.'s trade name for its clothing brand, utilizing Nike F.c., a few months after the launch of its St. Thomas F.c., and for the tort of *Civil R.I.C.O.,* after Havensight Capital L.L.C. found material discrepancies in a trillion dollar Facebook's representations, on sales of website clicks, and nonsensical pricing variances. **The initial District Court, decided that Nike Inc.'s felonious entry of privileged communications, in which Nike Inc.'s counsel boasted about having sex with the wife of one of the Plaintiff friends and former classmate was clever, and that Havensight Capital L.L.C. should be sanctioned for raising the issue.**

Additionally, in the Facebook Inc. case, counsel from the same defense Firm, preceded to concurrently represent anti-trust Parties, and feloniously enter private records again in the same matter, and the District Court came to the same

conclusion that sanctions were in order for the filing of that Case.  Both these

rulings were then upheld by the Appellate Court, which in both cases failed to

follow procedure, and moved pre-maturely to dismiss both matters, with

incoherent Orders, which were both less than a page in length.  In the Facebook

Inc. Appellate case: Facebook Inc.'s counsel was triple conflicted, the District

Court had cited to Facebook Inc.'s feloniously entered settlement offers, Facebook

Inc. had feloniously taken other records, filed a document late, filed an *Appellee*

*Brief*, which was too long, failed to set the record, argued a case that did not stand

for their respective position, and failed to serve their *Brief*.  The Appellate Court

moved on its own to end private records, and conflict checks, without the response

of Facebook Inc. to an Appellate *Motion*, signaling to the World that the Appellate

Court had been bribed, and didn't even possess the common sense to follow

Appellate procedure in the matter.  Referenced, in this *Complaint*, is the Plaintiff's

*Appellant's Brief*, in this matter, which ended private records, along with the

defunct and deficient *Oral Memorandum*, which erroneously dismissed the action,

which should have been dismissed with a proper order, which had been carefully

deliberated over.  **Finally, the Court decision to take the *Assignment Order***

**from the public record, demonstrates that it was aware that the Order was**

**defective and believed the bribe could be covered up.**

Additionally, in the months leading up to the ruling in the Nike Inc. Appellate case, the Plaintiff was approached by people claiming to be associated with an Appellate Justice on the Panel, whose name is to be filed under seal in discovery, and requested money from the Plaintiff on two separate occasions, while the Plaintiff was exercising, on the campus of Cal Poly, in San Luis Obispo, California.  The request, at the time, seemed comical, as a small business owner cannot match a trillion-dollar corporate in Judicial bribes, but in retrospect the matter seems incredibly serious now.

**Plaintiff contends that in all matters, in which the Courts patently demonstrated legally deficient and coerced rulings, including the Appellate Court's abolishment of private records, and conflict check permanently from the law, were motived from Gibson Dunn Inc.'s Leaders, and Facebook Inc. systematic payment of bribes to Judicial officials, and their relatives, and respective acquaintances.**  Plaintiff alleges that Gibson Dunn Inc. intentionally, and preciously pays these bribes from slush funds set up by Clients, and allegedly boasts about such practices.

Moreover, the Judicial officers demonstrate in their frequent pre-mature rulings throughout all of the matters that the Judicial officers were under financial influence, and responding illegally to stock price movements for these trillion dollar defendants.  The U.S. Government is requested to turn over satellite imagery

and communications, which exist, and captured these bribes, and which are known facts to the U.S. Government.  For the U.S. Government to condone such practices, is a threat to national security that few seem to really understand.  **While one could easily argue the manner in which the cases were adjudicated speak to potentially ineptitude and dementia, the fact that all matters were adjudicated in the same pre-mature and procedurally defunct manner, speaks to a broader picture of bribery, and to the Courts inability to exercise any discipline over trillion dollar defendants, not complete incompetence.**

Additionally, either, Gibson Dunn, or, Facebook Inc's contractors, at some point during the proceedings, allegedly hired Ms. Marjorie Roberts, an attorney in the U.S. Virgin Islands to impersonate Havensight Capital L.L.C.'s Counsel.  Ms. Roberts was a former Gibson Dunn employee and worked with Gibson Dunn's Counsels to precipitate material misrepresentations to the Appellate Court, and allegedly arranged payments to the Judges from Gibson Dunn.  Further, Gibson Dunn compounded its unbecoming behavior by withholding Memos unethically around Facebook Inc.'s price fixing, despite M.T.O. Counsel, Mr. Tung stating their existence in an in person conferral between Mr. Tung and the Plaintiff.  This meeting was insisted upon by Mr. Tung, and the existence of the Memos was volunteered to the Plaintiff by Mr. Tung, and not directly requested.

Furthermore, it should be noted that the Plaintiff alleges obstructions, and bribery against the Court highest Officer, Chief Justice Roberts.  It is alleged that he received compensation from Gibson Dunn L.L.P. on a routine basis, and his clerk was hired into the Dallas office of Gibson Dunn on a quid pro basis, perhaps even in return for favors around this matter.  **Ending private records and conflict checks is a legal precedence, which would stop any Chief Justice of the Supreme Court from proceeding as a steward of our legal system**.  He was not appointed by the President of the United States, to rescue Gibson Dunn L.L.P. from its plead felonious conduct, and it is not his duty to damage small business owners so that incompetent counsel can collect absorbent fees, he has disgraced the Position, and himself.  **He should do the honorable action, here, and resign as a result of conflict checks and private records, being permanently lost from the law, and cooperate with any investigation into his honeymoon with Gibson Dunn Inc. personnel by appointed Special Independent Counsel to investigate.** Such an abrogation of the Law is indecent, and no self-respecting Supreme Court Justice can justify doing favors, on a case that spoke so directly to the core foundation of legal principles.  Facebook Inc.'s triple conflicted representation, and plead felonious conduct, here, cannot be rewarded by any Court, which claims to be led by a reasonable legal mind.

Moreover, the Plaintiff also alleges that in addition to bribery, the U.S. Government also chose to end basic tenets of legal reasoning permanently, in order to retaliate and spite the Plaintiff for, dissension over the U.S. government's hijacking of the Plaintiff's life.

**Ironically, in the end, the inability for the U.S. Government to show Leadership, and unbias character, actually damaged the life of the Plaintiff, the Plaintiff's economic opportunity, and the Plaintiff's storied profession, far more than, any of the following: organized criminal, terrorist, or foreign government military actor acting in error.  The Judges and Leaders of Gibson Dunn on many levels are actually stronger threats than such terrorists and organized Criminals.**

When a Law Clerk in one of our Federal Courts finally proves to me that they are capable of applying statutory law, and not just ruling for a handicapped counselor, who will never hire them, as they themselves only have their respective job because of family contacts, I will applaud this profession once again.

Retrospectively, there are many Leaders who have proudly served our country, and have sustained physical damages, certainly more severe than those of the Plaintiff's.  The purpose of this action, here, is not to attempt to compete

against those sacrifices in any manner whatsoever, and we can only marvel at some of the heroics and sacrifices of many of the honest U.S. service people.  Rather, this Suit emerges from the inability of the U.S. Courts to function independently, and the need for all Leaders of the U.S. government to understand that singular oligarchs cannot cannibalize historical professionals, and prey on small businesses. I also don't want handicapped nonsense, and opaque bribery, as seen in these matters, to ever happen again to any legal professionals or small business owners. **I did everything I could to protect Pepperdine law students, and I now intend to do everything I can to protect all current and future law students, the 9th Circuit, here, did everything they could to further their alleged own bribery scheme even in the wake of felonies and conflicts.**  When our highest Judicial officer allegedly colludes, with untrained counselors at Gibson Dunn Inc. to end private records, systematic change is required immediately, even it comes at the expense of potential Constitutional erosions.  *U.S. Constitution.*


# ARGUMENT.


I. **Defendants have Allegedly Violated the Tort of Intentional Infliction of Emotional Distress.**

The elements for the tort of *I.I.E.D.* are as follows: 1) conduct in question was, either, intention or reckless, 2) conduct was extreme and outrageous, 3) there was causal connection between conduct and emotional distress, and 4) emotional distress was severe. *Faulkner v. Dillon*, 92 F. Supp. 3d 493 (W.D. Va. 2015). *See also*, *Hartwell v. Southwest Chesser Company*, 276 F. Supp. 3d. 1188 (D.N.M. 2016). *St. John v. International Ass'n of Machinsts and Aerospace Workers*, 139 F. 3d 1214 (8th Cir. 1998). Moreover, such a Claim is not barred by the *Federal Tort Claims act*. *28 U.S.C.A. 2680.*

The U.S. Government, here, committed an, either, intentional, or, reckless act when its Military allegedly few over the house of a U.S. civilian and burned the Plaintiff with military grade thermal weapons, which use is suppose to be limited to military combat. The act being the flying and use of the weapon. Further, it also committed a reckless act in failing to communicate with Plaintiff, who was then a U.S. citizen, and follow procedures, after multiple known assassination attempts on his life. The first set of assassination attempts occurred in early 2008 in Malibu, CA. and then again in Australia shortly thereafter, as plead in the statement of facts.

The Plaintiff, here, suffered high levels of stress as a result of these specific acts. For instance, the Plaintiff was bedridden, here, with acid reflux for days after the initial assassination attempts, and endured bouts of vomiting, nausea, and

headaches.  Additionally, the Plaintiff suffered insomnia, sensitivity to flickering of lights, inability to exercise, and severe chest pain, as a direct result of the U.S. government burning the Plaintiff with a special weapon from a military plane.  The Plaintiff frequently attempted, here, to sleep in the corner of rooms on the floor, and with reflective materials which were not effective, during the three month period of the burning.  Moreover, worse than the actual burning of the skin and extremities, was the anticipation at night of these attacks, which were cowardly and terrorist in nature.  Such anticipation brought psychological terror to the Plaintiff, and the Plaintiff presently has adverse reactions to unknown sources of lights.

Moreover, the Plaintiff alleges that the causation of this emotional stress was the direct result of the irrational assassination attempts on the Plaintiff, and the alleged burning of the Plaintiff by military planes, using a classified weapon.  This weapon specifically emits a silver rectangular square of light across the target before a thermal burning occurs which last for two to three seconds, and sends a burning sensation through the body and extremities, over about 20% of the body.  The Plaintiff felt the burning primarily in the chest area, but was once burned only in the legs and bottom portion of the body, such an act was the causation, here, of the emotional distress.  Additionally, the U.S. government by failing to communicate and follow procedures, after each of the assassination attempts,

detailed in the *Statement of Facts I*, here, also were the proximate cause for the physical and emotional discomfort experienced, including but not limited to: vomiting, extreme acid reflux, headaches, and sensitivity to unknown sources of light.  Further, the Plaintiff suffered damages, here, both, from these stated physical afflictions, in addition to its effect on his ability to pursue a career in the law and investments.

Additionally, the Plaintiff, here, alleges that either, Gibson Dunn, Facebook Inc., or, its contracting affiliates, which will be named in discovery, placed video recording devices, in the bedroom of a family member's home, which the Plaintiff was resting in, and even alerted the Plaintiff to its presence, in responding to Plaintiff's actions audially, via stationing at a hotel in proximity to the residence. *18 U.S.C. Section 245*.  Such a felonious violation, here, is reckless and outrageous, and intended to inflict physical distress.  Further, such surveillance was the proximate cause of the distress, and actually caused distress, as it affected the Plaintiff's ability to enjoy privacy of abode, which is a basic right.  *Id*.  The Court, here, should assign liability for this tort to, both, the private and government actors.

Moreover, the U.S. Government also inflicted emotional distress, in failing to follow 9th Circuit procedure, and prematurely making, a 2 in 1 ruling, after Facebook Inc. had not responded to an *Appellate Motion*.  The U.S. Government

was the proximate cause, in this instance, as the 9th Circuit published the improper

defective premature Order, ending private records and conflict checks

permanently.

## II.     Defendants have Allegedly Violated the Tort of Negligence.

A claim for negligence can be stated, in California, a Plaintiff must establish

the following elements: (1) the defendant had a duty, or an "obligation to conform

to a certain standard of conduct for the protection of others against unreasonable

risks," (2) the defendant breached that duty, (3) that breach proximately caused the

plaintiff's injuries, and (4) damages.  *Coarles v. Bennett*, 567 F.3d 554, 572 (9th

Cir. 2009) (quoting *McGarry v. Sax*, 70 Cal. Rptr. 3d 519, 530 (Ct. App. 2008)).

*Cross Bros. v. Meat Packers Inc*. v. 705 2d. 682 (1983). (Government breached a

duty in not communicating information and is actionable under the tort of

negligent misrepresentation).  *City of Santa Barbara v. Sup. Ct.*, 41 Cal. 4th 747

(2007). (Government cannot contract out of gross negligence).  *Bass v. South

Carolina Dept of Social Science*, 414 S.C. 558 (2015).

The alleged facts, here, meet the standards of negligence.  The U.S.

Government has a Constitutional duty to protect all U.S. Citizens from physical

harm, and economic harm from, either, physical criminal actions, or, even

electronic criminal actions – such as the takings of private records, which Gibson Dunn Inc. from the Plaintiff. *U.S. Constitution*. The U.S. Government breached this duty, here, when it failed to confer with the Plaintiff, on its unconsented incorporation into terrorist response strategies, when it failed to confer after multiple witnessed assassination attempts on the Plaintiff's life, and its burning of the Plaintiff using aerial warfare devices. Additionally, here, the U.S. Government also breached its duty, in allowing Gibson Dunn to end private records and conflict checks by allegedly bribing 9th Circuit Judges and Chief Justice John Roberts, with consideration for violating U.S. Statutory law. It also violated its duty, here, in allowing the Judicial Officers to meet with Alphabet Inc. and Gibson Dunn Inc.'s Counsels, who in this case were the same conflicted Counsel, without the Plaintiff's, either, presence, or, knowledge.

Moreover, the U.S. Government, here, further breached its duty and showed Negligence in failing to following any kind of procedure in the 9th Circuit as the alleged Bribed Judges, here, removed the *Assignment Order*, and issued a 2 in 1 pre-mature order for an *Appellate Motion*, which did not exist in the record, as its dismissive document. This came in conjunction with changing its *Order*, without notice in the Nike Inc. case, and upholding the felonious taking of an email, where Nike Inc.'s Counsel boasted about relations with the wife of the Plaintiff's friend. Further, the U.S. Government, here, can be held accountable for failing to

communicate information to Plaintiff, when such information concerned the well being and safety of the Plaintiff, and the U.S. Government's omissions are not shields to liability. *Cross Bros. v.*

Furthermore, the Plaintiff can demonstrate that these actions were the cause of stress and economic loss for the Plaintiff. The Plaintiff, here, was unable to recover on his tort, either, engage in business relations, or, live without fear of physical bodily harm, as a result of each, and every one of the U.S. Government's negligent acts. It is also important that the Court, here, understands that there are too many infractions, such as manipulating the Plaintiff's G.P.S. system while he was being pursued by Organized criminals, and allowing its Chief Justice to fraternize with Gibson Dunn to the point where he is unable to hold a Court, which can enforce a triple conflict and double digit felonies. The Court, here, can take the totality of all of these alleged actions, as a singular breach, which caused irreparable harm to the Plaintiff.

## III.   **Defendants have Allegedly Violated the Tort of Fraud on the Court.**

The elements for fraud are: either, a representation, or, concealment of fact, material to the transaction at hand, made falsely with knowledge of falsity or

recklessness as to whether it is true, intent to mislead, justifiable reliance, and a resulting injury. *FTCA, 28 U.S.C. §§ 2671-2680. Aero Fulfillment Services Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764 (2016). (Business misrepresentation to be sufficient for the tort of Fraud). *See also*, *U.S. v. Ford Motor Co.*, 532 F. 3d 496 (6th Cir. 2008). First, Gibson Dunn Inc. and conflicted Facebook Inc. and Alphabet Inc., here, failed to disclose their respective contacts with Judicial officers at the District Court level, and Appellate Court levels, which resulted in the ending of private records, and conflict checks in U.S. case law. Further, these Defendants, here, also failed to disclosed payments to Mr. Barack Obama, and Ms. Hillary Clinton, despite being requested by the Plaintiff in writing, as both these Leaders were involved in the appointment process of the overseeing Judicial panel at the Appellate Court, and in the appointment of the District Court Judge.

Moreover, the failure to make these legal disclosures of the Judicial contacts, and of the hiring of the Judicial appointing officers, here, was a concealment of fact, and would both independently satisfy the first element. *Id*. Further, these omissions were done with purpose. The Plaintiff, here, had submitted the disclosure requests in writing, and the Defendant purposefully withheld the information in order to quell any challenge to the conflicted Judiciary.

Second, either, Gibson Dunn, or, Facebook Inc. contractors, or, both, allegedly hired Ms. Marjorie Roberts to impersonate Havensight Capital L.L.C.

Counsel and further their respective material misrepresentations to the Appellate Court, which speaks to the very essence of the element of Fraud.  This was a material misrepresentation and impersonation of Counsel.  The Defendants were the proximate cause of this action, and it caused harm to the Plaintiff, in its inability to recover damages.  Third, either, Gibson Dunn, or, Facebook, here, allegedly feloniously accessed the Plaintiff's computer and stole this filing, before it was filed, in secession to already plead felonious taking of counsel communications.  This act, is criminal in nature, as it is a stolen legal record, and the Defendants, here, were the proximate cause of such a stealing, as they took it off the Defendant's computer, and caused irreparable harm.  *Id.*

Fourth, Gibson Dunn also failed to provide Memos around Facebook Inc.'s price fixing, which were in their respective possession. This is known, here, because Mr. Tung of M.T.O., which was the Firm of initial Counsel in this matter, disclosed that to the Plaintiff, in an in person conferral in M.T.O.'s office. *Plaintiff's Declaration*.  Mr. Tung voluntarily disclosed this fact to Plaintiff, and the meeting was at Mr. Tung's absolute insistence.  Thus, the Defendant, here, caused the Fraudulent act, by actively concealing the Memo, and this concealment caused harm, in the impairment of the Plaintiff's legal rights.  The fact that Plaintiff has to pay $48.00 for parking, after Mr. Tung's assurance that the parking would be validated, is not at issue.

Further, this fraud caused harm to the Plaintiff, as the Appellate Court did not examine the felonious conduct of Facebook Inc. and Alphabet Inc., and did not default the Defendants as was required by Federal Statutory law.  *18 U.S.C. Section 1030.*  Thus, there was reliance and damages suffered as a result of these fraudulent failures to disclose of, both, alleged Judicial contacts, and the alleged hiring of Mr. Obama, and Ms. Clinton, either, by both, or, each of the conflicted Parties.  There is inherent conflict, here, just in the disclosures of the hiring of both of them, and it is questionable whether removing conflict checks from case law, was a clever idea.  Thus, the Court, here, should find that all of elements for the tort of fraud, have been satisfied.

Moreover, Facebook Inc. and Gibson Dunn Inc. failed to disclose its contacts with Chief Justice John Roberts, here, and the hiring of his clerk in a quid pro scheme, and political favors and persuasion offered to U.S. Government Leaders.  This unethical compensation allegedly was provided to those U.S. Government Leaders, who advocated for the abolishment of private records and conflict checks, in return for campaign contributions, and the continued formation and operation of phantom companies in economically challenged States.  Many of these companies hired the unemployed, who resided in Jurisdictions of Judicial Officers.  Finally, there was causation and resulting injury, here, because the Plaintiff was unable to claim on its Torts, and the American People lost private

records in Federal U.S. Statutory law, and conflict checks within the legal system, as a result of Gibson Dunn's alleged fraudulent actions, here, and the U.S. Government's failure to take action against these alleged compromised Judicial officers.

Moreover, the Plaintiff, here, also independently alleges fraud against Alphabet Inc. and the United States Government, in working with U.S. Government agencies to restrict the Plaintiff's email correspondences, here, and limit his ability to form business relations with a variety of prospective entities. *Id*. This Act, here, alleges fraud in the representation that Alphabet Inc. was providing protected free speech communications, when in fact, it was allowing the U.S. government to surreptitiously restrict the sending of email correspondences by all correspondences, going to Government Agencies. Additionally, the Department of Defense, and Government Agencies posing, and impersonating the intended recipient of email correspondences, here, meets the very definition of a fraudulent act. This Act also was the causation of a resulting injury, as the Plaintiff was unable to make sales, network for jobs, and engage in other activities, which would lead to economic gain. Furthermore, causal injury, as a direct result of the Defendant's manipulating the Plaintiff's emails, in this instance, also occurred as the Plaintiff was unable to make personal connections with family and friends, and relevantly network.

Additionally, the Plaintiff alleges that the Defendants, here, have engaged in Fraud in failing to provide the Plaintiff with the concealed Facebook *Memo* about the defective nature of Facebook's pricing, which Mr. Tung of M.T.O. told the Plaintiff, while representing Facebook, and the *California Bar Orders to Settle*, in violation of Facebook Counsel's professional duty.  The Defendant, here, were the proximate cause of the misrepresentation, in the omission of providing these files, and the Plaintiff conferred, with over 1,000 emails, and fifty phone calls, requesting that the legal compliance documents be provided to the Plaintiff.

Moreover, the U.S. Government has engaged in Fraud, as the Appellate Court Clerk wrote and signed an *Appellate Motion*, which is felonious and was duly entered into the public record, in 9th circuit matter *15-56607*.  This is Fraud, here, as it is a material misrepresentation, as the Clerk attempted to represent herself as a Judge despite signing her own name on the Motion document, instead of that of a Judge.  The Clerk was the cause of the fraudulent error, and it caused harm, as it led to the ending of private records and conflict checks, and impaired the legal rights of the Plaintiff.

Additionally, the U.S. Government, here, engaged in Fraud, when it entered the *Assignment Order*, and then removed from the public record, in 9th Circuit matter *18-56304.  Federal Rule of Civil Procedure 60(d)(3).*  This Act was fraudulent, and committed because the 9th Circuit Judges knew they had taken a bribe and

broken procedure, in order to prop of Facebook's stock.  The Judicial Officers, here, have no respect for the Law, they simply are working on a very transparent pay to play scheme.  The 9th Circuit Clerks or Judges were the proximate cause of this removal of the *Assignment Orders,* as they are the only ones with access to the 9th Circuit system.  Further, this Fraudulent Act, here, caused irreparable harm, as it substantially impaired the rights of the Plaintiff.

Lastly, the Defendant has not provided the Plaintiff, here, with the *California Bar Orders to Settle*, which were sent to the Defendant for all three of the historically triple conflicted Clients.  Ms. Linsley, and Mr. Twomey, here, counsel for all three trillion dollar companies at once, despite their interests all be adverse to each other, have decided simply to not confer on emails, and voicemails requesting these documents.  Such an omission and act is fraudulent, and meets the legal definition of fraud.  *Id*.  Moreover, instead of fulfilling legal professional responsibilities, the Defendant, here, had more felonious contacts and parties with the Judges, which they knew to be illegal, but believe the legal process, here, to be a bribery quid pro scheme, and not a conferral between members of the California Bar.  The Defendants, here, are the proximate cause of this misrepresentation, and this misrepresentation has caused harm as it impaired the rights of the Plaintiff, and irreparably damaged the integrity of the legal profession.  The Plaintiff will serve this *Complaint* on the California Bar, and moves the California Bar to disbar all

Judges, and Counsels involved in these triple conflicted matters, who ended private records, and conflict checks permanently.


IV.     **Defendants have Allegedly Violated the Tort of Intentional Interference with Economical Prospective Advantage.**


The Defendants, here, have allegedly committed the tort of *I.I.E.P.R.* and restricted the Plaintiff from making sales, obtaining employment, and enjoying general economic advancement.  The tort has the following elements: 1) The Plaintiff and a third party were in an economic relationship that probably would have resulted in an economic benefit to him Defendant knew about the relationship, 2) Defendant engaged in a wrongful conduct, 3) By engaging in this conduct defendant intended to disrupt the relationship or knew that the disruption was substantially certain to occur, 4) The relationship was disrupted, The Plaintiff was harmed as the result of the Defendant's conduct. *Limandri v. Judkins,* 52 Cal.App.4th 326, 340 (1997).  Further, the Statue governs bribery and paid consideration, in return for interference *California Penal Code 641.3* and any paid consideration for intentional interference with a business is prohibited. *Smith v. Pure Oil Co.,* 278 Ky. 430, 434 (Ky. 1939).  The Plaintiff, here, allegedly established economic relations with various National governments, via his

Company, and sought employment as an attorney, while he was conscripted into counter terrorist measures.

Specifically, the Plaintiff, here, attempted to make sales of consumer products, and build business relations with the following Governments: The People Republic of China, German, French, English, Canadian, Mexican, Japan, and India. All of these attempts to do business with these Governments were either, interfered via email interference by U.S. agencies, or, in person interference by Government actors, who redirected, and thwarted attempts by the Plaintiff to meet with the Trade Leaders. Often, such actions were accomplished under the guise of protecting a security clearance, when in actuality, this same kind of behavior would actually undermine the U.S. Government, in the form of the Ninth Circuit eventually taking bribes, and ending private records and conflict checks for a trillion dollar Defendant.

Thus, the element of attempting to establish trade relations which would lead to economic benefit, here, is met by the Plaintiff's pleading of attempting to call and email Government officials to effectuate sales of consumer products if they fail to send tits again, across business lines. *Id*. Further, the U.S. Government disrupted the relationship and intended to disrupt the relationship, here, when it interfered with Plaintiff communications, via coercing Alphabet Inc. into giving it access to Plaintiff's emails, and in redirecting prospective meetings with

Government trade officials of a plethora of foreign Governments. Finally, the element of here of injury and economic loss, here, is satisfied, as the Plaintiff alleges that he would have benefited from sales of his products, and potential trade between the Plaintiff and these named Governments.

Moreover, Gibson Dunn Inc. and the three conflicted Clients, here, allegedly bribed private Banking Officials, which will remain anonymous until the discovery period, in offering consideration, in return for the Banking Leadership to deny services and capital to the Defendant. Specifically, the Plaintiff witnessed, consultants for the Defendants, observing the meeting, between the Bankers, and the Plaintiff, which was both disconcerting, and bizarre. Further, the Defendant only could have arranged such bribes of private banking officials, if they had illegally accessed the Plaintiff's email. Thus, there was allegedly tortious and felonious interference, even before the act of bribery. *Id*. The Defendants, here, were the proximate cause, as it was, either, them, or, their hired contractors, who harassed our Bankers, and entered our email feloniously. There was actual disruption, here, as the Plaintiff was not able to list its private Company, on an exchange. The Plaintiff never divulged information about Customers and Capital Markets Bankers publicly, and only felonious entry into our email, could have produced such interference. Thus, the individual elements, here, were met.

Further, such conduct alleged, here, is not surprising, provided that these three conflicted Clients, plead the stealing of privileged attorney emails, and allegedly disseminated stolen legal files to the U.S. Government from Plaintiff's computer.  Gibson Dunn's triple conflicted Counsel allegedly stole a draft of this very legal file from the Plaintiff's computer and shared it with their Clients, and feloniously divulged it to the U.S. Government.  *Id*.  Such conduct, here, is in direct violation of *18 U.S.C. Section 1030*, and it is questionable whether triple conflicted Counsel, should try and assert the bribery case in question, which legalizes the stealing of electronic records, and attempts to overturn this *Federal Statue*.  We are unsure if the 9th Circuit Leadership understands the irreparable damage of ending private records, in order to allow a multi-million dollar Attorney to bill for her felonies.

This specific tortious action, here, was allegedly compounded by Facebook Inc. routinely harassing the Plaintiff's prospective Customers, across the World, ranging as far as the South Pacific, and the Plaintiff alleges that Customers were harassed, lied to, and provided with consideration, in order to ensure that the Plaintiff's business failed.  On numerous occasions, prospective Clients bizarrely, either, broke off communications, or, a contracting Firm operated by the triple conflicted Clients, came in and attempted to bid on contracts that the Plaintiff was working on.  This interference also spans indigenous groups that the Plaintiff

solicited for phone services, who then were hired as contractors by the conflicted Clients deliberately, in order to obliterate the Plaintiff's business.  The Plaintiff sent voluminous warnings to the Defendant's Counsel, regarding the direct interference with prospective Customers, and all of the communications, were not responded to.

Intriguingly, the triple conflicted Counsel believes in not conferring, but constantly communicating and obfuscating potential business leads, after feloniously entering the Plaintiff's email, she has it the wrong way around, and I truly hope this Court, is more perspicacious than the bribed Court.  We are also unsure whether the triple conflicted Counsel had intimated to certain Parties that they owned the Companies, which would be bizarre and felonious, as the conflicted Counsel had only won a personal judgment off of their bribes of the Judicial Officers.  This fact needs to be investigated by the U.S. Attorney.  The triple conflicted Clients, here, were the proximate cause of the interference as they contacted and in some instances hired our prospective Customers and Bankers, there was an economic relations, as we had commenced forming contractual relations, and these relations were disrupted by either, the transfer of consideration by the Defendants, or, the communications of false statements and misrepresentations.  *Limandri v.*  In conclusion, the Court should find intentional

interference with contractual relations, and impute liability to all three trillion dollar Companies, via operation of law, as they were triple conflicted at the time.

## CONCLUSION.

The Jury should award the Plaintiff the requested damages in this matter for all of the Defendant's tortious acts, which were: intentional, beyond egregious, and now known. *Waits v. Frito-Lay Inc.,* 978 F. 2d 1093 (9th Cir. 1992).

## REQUEST FOR JURY TRIAL.

The Plaintiff requests a jury trial in this matter. *28 U.S. Code Section 1411.*

## REQUEST FOR DAMAGES AND PUNITIVE DAMAGES.

The Plaintiff requests that the Court moves on its own to request that the 9th Circuit Appellate Court re-open 9th Circuit cases *No. 18-5603*, and *No. 15-56607*, reinstate private records, and conflict checks, as a result of Defendant's hiring of Panel Judicial appointees, in order to protect the rights of the public.  Additionally,

a Jury should award $25,000,000 and any amount of punitive damages, which its deems judicious against each of the named Defendants.

Further, the U.S. Government should also appoint an independent Special Master immediately to oversee the initial closure and administration of the Ninth Circuit Court, until the U.S. government can determine which Judicial actors acted in concert with Facebook Inc., Nike Inc., and Gibson Dunn Inc. to end private records, and conflict checks. Finally, Congress should also empower this Special Master to proceed with prosecution of the Chief Justice of the United States, should it be determined that he violated the *Constitution of the United States of America*, and the Office of the Chief Justice, in allegedly assisting Gibson Dunn, with the ending of private records, and conflict checks, in return for pecuniary gain for, either, himself, or, Supreme Court clerks.

Respectfully submitted,

*/s/ Benjamin Woodhouse*
Benjamin Woodhouse esq.
2369 Kronprinsends Gade, Ste. #8
Charlotte, VI. 00801
805 478 1958
California Bar #261361